[No. B236269. Second Dist., Div. Five. Mar. 20, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
KATHARINE LOUISE McCALL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts I. through III.A. and IV. of this opinion are certified for publication.

**COUNSEL**

Carla Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TURNER, P. J.—**

## I.  INTRODUCTION

A jury convicted defendant, Katharine Louise McCall, of practicing medicine without certification, a felony. (Bus. & Prof. Code,[1] § 2052, subd. (a).) She was placed on three years' probation. Defendant, an unlicensed, unsupervised student midwife, asserts she could not be prosecuted for a felony as charged. Rather, defendant argues, she could only be convicted of a misdemeanor violation of the Licensed Midwifery Practice Act of 1993 (the Midwifery Act) (§ 2505 et seq.). In the published portion of this opinion, we explain why defendant could properly be convicted as charged. In addition, defendant argues she was convicted of an offense not shown by the evidence at the preliminary hearing and she may have been convicted based on a legally incorrect theory. In the unpublished portion of this opinion, we explain why any error in granting the prosecutor's motion to amend the information was harmless. We further conclude defendant's legally invalid theory contention is without merit.

---

[1] Except where otherwise noted, all further statutory references are to the Business and Professions Code.

## II. THE EVIDENCE

The central facts are undisputed. Defendant was a student midwife. She was not licensed to act as a midwife. Under the Midwifery Act, she was authorized to engage in midwifery only as part of her course of study. Further, she could lawfully engage in midwifery only under the supervision of a licensed midwife, "who is present on the premises at all times client services are provided," or a physician and surgeon. (§ 2514, subd. (a).) In November 2007, Joy Tienzo, who was six to seven months pregnant, contracted with defendant for midwife services. In their conversations, defendant said she was not licensed. Ms. Tienzo was told a licensed midwife would attend the birth. Defendant provided prenatal care to Ms. Tienzo on a regular basis over several weeks. Defendant checked Ms. Tienzo's blood pressure and conducted urine tests. Defendant palpated Ms. Tienzo's abdomen and monitored the fetus's heart rate. Defendant attended Ms. Tienzo's labor and delivery. During the labor and delivery, defendant checked Ms. Tienzo's vital signs; examined Ms. Tienzo's cervical dilation; monitored the baby's heart rate; told Ms. Tienzo the baby had "shoulder dystocia"—that is, the baby's head was stuck against Ms. Tienzo's pelvic bone; guided the baby out; clamped and cut the umbilical cord; manually removed the placenta from the uterine wall; gave Ms. Tienzo an injection of Pitocin to stop hemorrhaging; and administered lidocaine and sutured a tear in Ms. Tienzo's perineum. At no time during the labor and delivery did defendant make any effort to call an emergency operator. During a postdelivery checkup, defendant examined the sutures and offered to remove excess skin at the site. Ms. Tienzo declined the offer. At no time was defendant supervised by a licensed midwife, a physician or a surgeon.

There was conflicting testimony as to whether defendant had engaged in the uncertified practice of medicine. There was also evidence defendant had been confronted with an emergency situation during the delivery. In addition to considering the testimony, we have examined all of the exhibits.

Dr. Erich Pollak was called as a witness for the prosecution. Dr. Pollak had been practicing medicine for 50 years. He was a medical consultant with the Medical Board of California. He had participated in the investigation of defendant's conduct. Dr. Pollak opined that a layperson who engages in examination, diagnosis, treatment or operation has unlawfully practiced medicine. According to Dr. Pollak, an unlicensed and unsupervised student midwife engages in the uncertified practice of medicine when he or she checks a patient's blood pressure; conducts urinalysis; palpates a pregnant patient's abdomen; checks a baby's heart rate with a Doppler ultrasound; examines a woman's cervix for dilation during labor; guides a baby out of the birth canal; clamps and cuts an umbilical cord; removes the placenta;

administers Pitocin or lidocaine; stitches a perineal tear; performs a newborn checkup; examines sutures; and offers to remove a flap of skin.

Dr. Martin Chenevert testified for the defense. Dr. Chenevert disagreed with Dr. Pollak's opinion that defendant practiced medicine without certification during the prenatal visits with Ms. Tienzo. In Dr. Chenevert's opinion, an unlicensed student midwife may perform the following acts without illegally practicing medicine so long as the student has not diagnosed or treated the patient: take a patient's blood pressure; listen to a baby's heartbeat with a Doppler ultrasound; palpate a pregnant woman's stomach; and have a woman urinate on a protein strip. In addition, so long as a layperson does not make a "firm diagnosis," palpating a pregnant woman's stomach and suspecting a breech position does not constitute practicing medicine. Dr. Chenevert further explained that shoulder dystocia constitutes a medical emergency. Under those circumstances, seeking emergency assistance would not be a sufficient response. The emergency would have to be dealt with at the location where it occurred. Postpartum hemorrhaging is a potentially life-threatening situation. It would be appropriate for a student midwife to respond on site and administer Pitocin to reduce bleeding. It would also be appropriate to stitch a perineal tear to stop further blood loss where a patient had already lost a lot of blood from another source.

Dr. Stuart Fischbein also testified for the defense. Dr. Fischbein had 25 years' experience as an obstetrician and gynecologist. Dr. Fischbein agreed with Dr. Pollak that the following conduct constituted practicing medicine: suturing; placenta removal; and administering Pitocin. Dr. Fischbein disagreed, however, that defendant had practiced medicine during the prenatal visits. Dr. Fischbein testified: "[P]renatal care in the midwifery model is essentially 95 percent advice and 5 percent screening, and I don't consider either of those to be the practice of medicine." Dr. Fischbein testified that if shoulder dystocia occurred, the condition would have had to be resolved within a minute or two. Dr. Fischbein also testified, however, that defendant did unlawfully practice medicine when she delivered Ms. Tienzo's baby.

## III. DISCUSSION

### A. Defendant Was Subject to Felony Prosecution

#### 1. The *Williamson* Rule

Defendant asserts she could not lawfully be subject to felony prosecution under the general statute prohibiting the uncertified practice of medicine. (§ 2052, subd. (a).) Rather, defendant argues she was subject only to misdemeanor prosecution for violating the Midwifery Act (§ 2514). She argues

section 2514, a specific criminal statute governing midwifery, supplants section 2052, subdivision (a), a general prohibition governing medical practice. (See *People v. Murphy* (2011) 52 Cal.4th 81, 86–88 [127 Cal.Rptr.3d 78, 253 P.3d 1216]; *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1250, fn. 14 [265 Cal.Rptr. 144, 783 P.2d 731]; *In re Williamson* (1954) 43 Cal.2d 651, 655 [276 P.2d 593].) The issue, defendant claims, is whether she is being subjected to a greater punishment than that specified by the Legislature. (See *Mitchell v. Superior Court, supra,* 49 Cal.3d at p. 1250, fn. 14; *People v. Woods* (1986) 177 Cal.App.3d 327, 333–334 [222 Cal.Rptr. 868].) Defendant's argument is without merit.

■ Our review is governed by the rules of statutory construction. (See *People v. Murphy, supra,* 52 Cal.4th at pp. 86–88; *In re Williamson, supra,* 43 Cal.2d at p. 655.) As our Supreme Court has explained: "[W]e must look first to the words of the statute because they are the most reliable indicator of legislative intent. (*People v. Lawrence* (2000) 24 Cal.4th 219, 230 [99 Cal.Rptr.2d 570, 6 P.3d 228].) If the statutory language is clear and unambiguous, the plain meaning of the statute governs. (*Id.* at pp. 230–231.)" (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056 [6 Cal.Rptr.3d 432, 79 P.3d 548]; accord, *People v. Licas* (2007) 41 Cal.4th 362, 367 [60 Cal.Rptr.3d 31, 159 P.3d 507].) Further, " 'We do not . . . consider the statutory language "in isolation." [Citation.] Rather, we [must] look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] That is, we [should] construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute . . . .' [Citation.]" . . .' (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].)" (*In re Reeves* (2005) 35 Cal.4th 765, 783 [28 Cal.Rptr.3d 4, 110 P.3d 1218].)

■ The rule of law on which defendant relies was set forth in *In re Williamson, supra,* 43 Cal.2d at page 654. " 'It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment. Where the special statute is later it will be regarded as an exception to or qualification of the prior general one; and where the general act is later the special statute will be considered as remaining an exception to its terms unless it is repealed in general words or by necessary implication.' (*People v. Breyer* [(1934)] 139 Cal.App. 547, 550 [34 P.2d 1065]; *Riley v. Forbes* [(1924)] 193 Cal. 740, 845 [227 P. 768].)" (*In re Williamson, supra,* 43 Cal.2d at p. 654; accord, *People v. Murphy, supra,* 52 Cal.4th at p. 86.) Our Supreme Court examined the *Williamson* rule in *People v. Murphy, supra,* 52 Cal.4th at pages 86–88: "Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that ·conduct to be prosecuted exclusively under the

special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. ([*In re Williamson, supra*, 43 Cal.2d at p. 654].) 'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.' (*People v. Walker* (2002) 29 Cal.4th 577, 586 [128 Cal.Rptr.2d 75, 59 P.3d 150].) 'The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent. The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . ." (*People v. Gilbert* [(1969)] 1 Cal.3d [475,] 481 [82 Cal.Rptr. 724, 462 P.2d 580].)' (*People v. Jenkins* (1980) 28 Cal.3d 494, 505–506 [170 Cal.Rptr. 1, 620 P.2d 587], fn. omitted . . . .) [¶] Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' (*People v. Watson* (1981) 30 Cal.3d 290, 295–296 [179 Cal.Rptr. 43, 637 P.2d 279] . . . .) In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute." (*Id.* at p. 86.)

In *Williamson*, for example, the defendant was charged with conspiring to act as a contractor without a license in violation of the general conspiracy statute, Penal Code section 182, former subdivision 1. The charged conspiracy was punishable as a misdemeanor or as a felony. (Pen. Code, § 182.) However, the Business and Professions Code specifically provided that conspiring to act as a contractor without a license was a misdemeanor. Former section 7028 stated, " 'It is unlawful for any person to engage in the business or act in the capacity of a contractor within this state without having a license therefor unless such person is particularly exempted from the provisions of this chapter.' " (*In re Williamson, supra*, 43 Cal.2d at p. 652, fn. 1.) Former section 7030 stated, " 'Any person who acts in the capacity of a contractor without a license, and any person who conspires with another person to violate any of the provisions of this [licensing] chapter is guilty of a misdemeanor.' " (43 Cal.2d at p. 653, fn. 2.) Our Supreme Court held the specific statute clearly controlled over the general one. (*Id.* at p. 654.) Our Supreme Court reasoned, "To conclude that the punishment for the violation of section 7030 of the Business and Professions Code is stated in section 182

of the Penal Code, which deals with conspiracies in general, would be inconsistent with the designation of the particular conspiracy as a misdemeanor." (*Id.* at p. 655.)

## 2. Statutory Context

### a. Overview

Both the general provision under which defendant was convicted and the specific statute governing midwifery are found in division 2 of the Business and Professions Code, Healing Arts, chapter 5, the Medical Practice Act (§ 2000 et seq.) The Medical Practice Act contains more than 30 articles including article 3, License Required and Exemptions (§ 2050 et seq.) and article 24, Licensed Midwives (§ 2505 et seq.).

### b. Article 3: The Physician's and Surgeon's Certificate

■ The Division of Licensing of the Medical Board of California is authorized to issue a physician's and surgeon's certificate. (§ 2050.) A physician's and surgeon's certificate authorizes the holder as follows: "[T]o use drugs or devices in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, and other physical and mental conditions." (§ 2051.) A person who engages in such acts without a physician's and surgeon's certificate is guilty of a felony or a misdemeanor. "[A]ny person who practices or attempts to practice . . . any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment [in the state prison], by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment." (§ 2052, subd. (a).)[2] Section 2052, subdivision (c) provides, "The remedy provided in this section shall not preclude any other remedy provided by law." Section 2061 provides, "Nothing in this chapter shall be

---

[2] After defendant committed the present offense, effective October 1, 2011, section 2052, subdivision (a), was amended to state the offense is punishable "by a fine not exceeding ten thousand dollars ($10,000), *by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code*, by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment." (Stats. 2011, ch. 15, § 11, italics added.)

construed as limiting the practice of other persons licensed, certified, or registered under any other provision of law relating to the healing arts when such person is engaged in his or her authorized and licensed practice."

### c. Article 24: The Licensed Midwifery Practice Act

Article 24 of chapter 5 of division 2 of the Business and Professions Code, part of the Medical Practice Act, contains the Midwifery Act. The legislative purpose in adopting the Midwifery Act was to increase the availability of prenatal, delivery and postdelivery care to low-income women. Increased access to prenatal and delivery care was expected to decrease the high rate of mortality due to low birth weight in newborns. (Stats. 1993, ch. 1280, § 1, pp. 7535–7536.)[3] The Midwifery Act authorizes the Division of Licensing of the Medical Board of California to issue a license to practice midwifery. (§ 2505 et seq.) A person is qualified for a midwifery license only after meeting specified educational and clinical practice requirements. (§ 2512.5.) A midwifery license authorizes the holder, in "cases of normal childbirth," "to provide prenatal, intrapartum, and postpartum care" for the mother. (§ 2507, subd. (a).) In addition, a midwife license holder is permitted to

---

[3] The codified statement of legislative intent reads: "The Legislature finds and declares all of the following: [¶] (a) Over 40,000 babies die every year in the United States, many of them as a result of being born severely underweight. That rate, among the worst in the developed world, has been condemned by health experts as a preventable tragedy and a national disgrace. [¶] (b) Research has shown for every dollar society might spend to reduce the number of underweight births, three dollars ($3) in medical-care costs could be saved. [¶] (c) The increasing state budget deficit limits the amounts of state funds available to subsidize public health care. [¶] (d) It is in agreement with the principle stated by the World Health Organization that each woman has a fundamental right to receive proper prenatal care, that the woman has a central role in all aspects of this care, including participation in the planning, carrying out, and evaluation of the care, and that social, emotional, and psychological factors are decisive in the understanding and implementation of proper prenatal care. [¶] (e) Prenatal care reduces the incidence of low birth weights. [¶] (f) The number of available physicians and surgeons to serve low-income pregnant women has sharply decreased. [¶] (g) Five nations with the lowest prenatal mortality rates have 70 percent of all births attended by midwives. [¶] (h) In a 1982 report by the Department of Consumer Affairs, recommendations were made to actively promote nurse and nonnurse midwifery services as one means of providing cost-effective, comprehensive perinatal services which have been shown to be effective in lowering perinatal morbidity and mortality rates. [¶] (i) The Office of Statewide Health Planning and Development (OSHPD) recommended in its 1986 study of Alternative Birthing Methods that a separate category of licensed midwives should be established in the Department of Consumer Affairs. [¶] (j) The OSHPD further recommended that competencies for this new category should be comparable to those of nurse-midwives and physician assistant-midwives, although licensure as a registered nurse or physician assistant should not be required to become a licensed midwife. [¶] (k) The Legislature supports a multifaceted, cost-effective approach which includes licensed midwives providing prenatal, delivery and necessary followup care to families." (Stats. 1993, ch. 1280, § 1, pp. 7535–7536.)

provide "immediate care for the newborn." (§ 2507, subd. (a).)[4] However, a licensed midwife must be supervised by a licensed physician and surgeon. The physician and surgeon need not be physically present. (§ 2507, subds. (a)–(c).) A licensed midwife must make specific disclosures to prospective clients. (§ 2508.) A licensed midwife also must meet annual reporting requirements. (§ 2516.) A person not licensed to practice midwifery may not hold him- or herself out as so licensed or imply that he or she is a licensed midwife. (§ 2511, subd. (a).) A licensed midwife is not authorized to practice medicine. Section 2507, subdivision (e) states, "A midwife is *not* authorized to practice medicine and surgery by this article." And a midwifery license can be suspended or revoked for unprofessional conduct including a conviction for practicing medicine without certification in violation of section 2052. (§ 2519, subd. (a)(2).)

With respect to midwifery students, section 2514 permits a student midwife to practice midwifery as part of his or her course of study. But the student midwife may only act under the direct—at all times present—supervision of a licensed midwife, a physician or a surgeon. Section 2514 states: "Nothing in this chapter shall be construed to prevent a bona fide student who is enrolled or participating in a midwifery education program or who is enrolled in a program of supervised clinical training from engaging in the practice of midwifery in this state, as part of his or her course of study, if both of the following conditions are met: [¶] (a) The student is under the supervision of a licensed midwife, who holds a clear and unrestricted license in this state, who is present on the premises at all times client services are provided, and who is practicing pursuant to Section 2507, or a physician and surgeon. [¶] (b) The client is informed of the student's status." Section 2521 makes any violation of the Midwifery Act a misdemeanor: "Any person who violates this article is guilty of a misdemeanor."

### d. Defendant Was Subject to Felony Prosecution for Practicing Medicine Without Certification

■ It is clear from the foregoing that the general and specific statutes do not overlap. Section 2052, subdivision (a), generally prohibits practicing medicine without a physician's and surgeon's certificate. The Midwifery Act provides for the licensing and regulation of midwives. It authorizes licensed midwives to assist in normal childbirth under a physician's supervision. Nothing in the Midwifery Act shields a midwife, licensed or unlicensed, from prosecution for practicing medicine without certification. (§§ 2507, subd. (e),

---

[4] Normal childbirth is defined and the scope of a midwife's care is delineated in the Medical Board of California, Division of Licensing's Standard of Care for California Licensed Midwives (Sept. 15, 2005). (<http://www.mbc.ca.gov/allied/midwives_standards.pdf> [as of Mar. 20, 2013].)

2519, subd. (a)(2); see *Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 484–496 [134 Cal.Rptr. 630, 556 P.2d 1081] [criminal complaint properly charged uncertified midwife with unlicensed practice of medicine]; *Northrup v. Superior Court* (1987) 192 Cal.App.3d 276, 280 [237 Cal.Rptr. 255] [unlicensed midwifery is treatment of physical condition within meaning of § 2052].)

Further, none of the elements of the general statute correspond to those of the special statute. The following are the acts prohibited by section 2052, subdivision (a): "[A]ny person who practices or attempts to practice . . . any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person . . . ." The specific statute authorizes the Medical Board of California to license a midwife once he or she meets specified education and clinical practice requirements. It also requires that a licensed midwife be supervised by a licensed physician and surgeon; act as a midwife only in cases of normal childbirth; make specific disclosures to prospective clients; and report specified information annually. The specific statute prohibits a person from holding him- or herself out as a midwife unless licensed. A person violates the Midwifery Act by holding him- or herself out as a midwife when not licensed as such, or by failing to make required disclosures or to report required information. In none of those situations does the violation result in the illegal practice of medicine. Further, the Midwifery Act does not authorize a licensed midwife to practice medicine or surgery. As noted, section 2507, subdivision (e) expressly states a midwife may not practice medicine or surgery as a result of the enactment of the Midwifery Act. Also, section 2519, subdivision (a)(2) provides the Medical Board of California may revoke a license issued to a midwife who violates the general statute. Defendant may have committed a misdemeanor violation of the Midwifery Act by performing midwife services without the required supervision of a licensed midwife or a physician and surgeon. But she did a great deal more than that. Her conduct above and beyond the failure to secure supervision constituted, as the jury found, practicing medicine without certification, a felony violation of the general statute.

B., C.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1006.

## IV.   DISPOSITION

The judgment is affirmed.

Armstrong, J., and Kriegler, J., concurred.

A petition for a rehearing was denied April 18, 2013, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 10, 2013, S210350.